OPINION OF THE COURT
Richard B. Meyer, J.
*393 The defendant was convicted by plea on May 30, 2006 of the misdemeanor crime of petit larceny (Penal Law § 155.25). The plea agreement called for the defendant to make restitution or pay reparation (Penal Law § 60.27)[1] to the victim. Initially, the parties agreed to have a forensic accountant employed by the New York State Police analyze the records and recommend the reparation amount. The defendant disagreed with the recommended amount and a restitution hearing was held on January 26, 2007.
The defendant’s conviction arises out of her retention of commissions paid on certain real estate sales while she acted as a licensed sales agent for Leilani Sprague, a licensed broker doing business under the assumed name of Country Road Realty (CRR). As a sales agent for Sprague, the defendant received compensation consisting of 20% of CRR’s commissions if defendant was the listing agent and 30% if she was the selling agent. Thus, if the defendant was both the selling and the listing agent for a successful sales transaction she received 50% of CRR’s total commission.
Unbeknown to Sprague, during the period of January through August 2004, the defendant deposited 14 checks payable to CRR, representing down payments and commissions on sales of properties listed with CRR, into the defendant’s personal and business bank accounts. Also during that period, and specifically on July 9, 2004, the defendant requested a loan from Sprague in the principal amount of $10,000, to be paid from future commissions earned by the defendant acting as a CRR agent. At the time of execution of the promissory note, up to six sales transactions were under contract awaiting closing for which the defendant was to earn commissions of between $8,831 to $9,143,[2] all of which were to be applied to the debt.
When Sprague learned of the diversion of funds, she issued a notice on September 9, 2004 announcing that the defendant no longer represented CRR and that all transactions would thereafter be handled by Sprague. On September 13, 2004, Sprague sent the defendant a letter by certified mail, return receipt requested, which was never claimed or received by the defendant, in which Sprague terminated their broker-agent relationship and advised that CRR would honor all sales and listing *394 agreements. It was not until April 2005 that Sprague filed a notice with the Department of State terminating her association with the defendant (Real Property Law § 442-b).
At the hearing, Sprague agreed to accept the forensic accountant’s calculation of the reparation amount of $25,031, including the $10,000 loan, with a net balance owed of $22,051 after applying credits in favor of the defendant amounting to $2,980. The defendant admitted to diverting $10,130.50 of CRR’s funds, but claimed to be entitled to credits for commissions paid to CRR on sales for which she was the selling and/or listing agent and that certain items included in the forensic accountant’s calculations were not correct. She also disputed that the $10,000 loan should be included in the reparation to be paid, although she did not deny that it was owed.
The People bear the burden of proving the amount of restitution to be paid, and in so doing must show not only the loss sustained by the victim due to the defendant’s conduct but any benefit received by the victim as well.
“At a restitution hearing, the People bear the burden of proving the victim’s out-of-pocket loss— the amount necessary to make the victim whole — by a preponderance of the evidence (see People v Horne, 97 NY2d 404, 410-411 [2002]; Consalvo, 89 NY2d at 145). To meet that burden, the People must show both components of the restitution equation, the amount taken minus the benefit conferred (see State v Beavers, 300 Mont 49, 53, 3 P3d 614, 616 [2000]; Bowman v State, 698 So 2d 615, 616 [Fla App 1997]; State v Tutor, 538 NW2d 894, 897 [Iowa App 1995]). To hold otherwise would contravene both the words and the intent of the statute, ‘to prevent the victim from enjoying an unjust enrichment, and the defendant from suffering under an unduly harsh and unreasonable restitution order’ (Mem of Attorney General, Bill Jacket, L 1992, ch 618, at 25).” (People v Tzitzikalakis, 8 NY3d 217, 221-222 [2007] [footnotes omitted].)
Based upon the testimony and exhibits from the restitution hearing, the loan must be included as part of the reparation since it constitutes a portion of the out-of-pocket loss incurred by Sprague and was caused by the defendant’s admitted criminal conduct (Penal Law § 60.27 [1]). In requesting the loan from Sprague, the defendant represented that she would repay up to $9,143 of the debt from commissions to be earned by her from *395 six pending sales under contract which were awaiting closing. Rather than turn the commissions from five[3] of those sales transactions over to Sprague, the defendant retained from more than one of those transactions not only the portion representing her commission but the portion normally due CRR as well. Based upon these facts, and the defendant’s admission at the hearing that no portion of the loan had been repaid, the loan constitutes out-of-pocket loss within the meaning of the statute.
As to the remaining items of loss identified on CRR’s spreadsheet[4] and the forensic accountant’s report,[5] the evidence at the hearing established that one item should not be included at all and that two other items cannot be included in the amounts claimed by Sprague. The sum of $432, representing referral fees paid by Kavanaugh Realty, cannot be included. The defendant testified that Sprague told her that she could keep those monies, an assertion which was not refuted by Sprague or by any exhibits admitted into evidence. This item cannot be included in the reparation amount.
Also, while Sprague claimed to be owed a 7% commission of $5,075 on the DeNeale to lease sales transaction on the grounds that she never agreed to a commission of 5% the listing agreement clearly provides for a 5% commission and three other sales transactions involved commissions of 6%.[6] Moreover, there was no evidence or claim that the defendant listed the property at the lower commission rate as part of any scheme to deprive Sprague of money or to benefit herself. The commission of $5,075 sought by Sprague does not constitute out-of-pocket loss caused by the defendant’s criminal conduct, and therefore only the actual commission paid of $3,625 may be included in the reparation to be paid by the defendant.
The defendant is also entitled to one half of the commission on the Lee to lease transaction in the amount of $1,890, instead of a 30% share equal to $1,134, based upon her unchallenged testimony that Sprague agreed to pay her as both the listing and selling agent. Sprague testified that she could not dispute that claim as she could not recall one way or the other if she made such an agreement. Since the evidence at the hearing *396 established that Sprague only received the escrow deposit of $1,000 and was entitled to one half of the commission, the out-of-pocket loss for this transaction is $890.
The remaining calculations of the forensic accountant are found to be correct, and applying the foregoing adjustments the total gross reparation amount before consideration of any other deductions is $22,393.[7]
CRR acknowledged that it was holding commissions earned by the defendant of $2,325 on the D.H.C. to lease transaction and $655 on the Delaney to Park sale, and the forensic accountant correctly applied those credits totaling $2,980 to the reparation amount. Deduction of that credit reduces the gross reparation amount from $22,393 to $19,413.
The defendant is entitled to additional credits for commissions received by CRR from three transactions since “courts must consider not only the amount taken by the defendant but also the value of any benefit received by the victim” (People v Tzitzikalakis, supra at 220). The execution by Sprague of a replacement listing agreement with Doyle on January 10, 2005, providing for a commission of 6% rather than 7%, without more, does not operate to preclude the defendant from being credited with the listing agent’s compensation. The fact that the Doyles did not want to be associated with the defendant, as testified to by Sprague, does not negate the beneficial impact of the listing obtained by the defendant. Nor does it justify consideration of the January 10, 2005 replacement listing contract as an intervening event sufficient to sever the causal relationship between the defendant’s listing and the benefit received by CRR. It is undisputed that the original listing with CRR was procured by the defendant on June 8, 2004, was valid for one year and contained no provision allowing the owners to unilaterally terminate the listing before that period expired. Also, the listing agreement benefitted Sprague in that she was able to act as the broker and procure a ready and willing buyer who ultimately purchased the property, albeit at the 6% commission rate renegotiated by Sprague in January 2005. While no other evidence was presented as to the reason for the January 10, 2005 listing agreement, the court infers from Sprague’s testimony that she agreed to the lower commission rate in order to keep the Doyles happy. Furthermore, since the defendant’s commis *397 sions as listing agent were dependent upon the sale of the listed properties during the term of the listing agreement, she was entitled to those commissions regardless of whether the agency relationship with Sprague had terminated (see Mitchell, Inc. v Dannemann Hosiery Mills, 258 NY 22 [1931]; Watts v Columbia Artists Mgt., 188 AD2d 799 [1992]; Hamond & Co. v Risk Specialists Co. of N.Y., 210 AD2d 202 [1994]).
Here, the sales of three properties listed by the defendant with CRR were consummated prior to the expiration dates of the listing contracts, specifically Berry to Moulton,[8] Esposito to Moulton[9] and Doyle to Lugo deSlosser,[10] and the defendant should be credited with the listing agent’s 20% share of the commissions, being $1,085, $2,485 and $3,858, respectively, and totaling $7,428. Sprague’s payment of the 20% listing agent share of the commissions on those sales to the sales agents who did not procure the listings does not operate to the detriment of the defendant. No reason for paying the 20% listing agent share was established by the evidence, and Sprague’s payment of those shares to the sales persons entitled only to the 30% selling agent share was, at best, gratuitous. Sprague was entitled to keep the listing agent shares of those commissions and apply them as payments on the loan made to the defendant.
By reason of the foregoing, the reparation amount to be imposed upon the defendant at the time of sentencing is $11,985.
The defendant’s remaining claims, including the claim for a credit representing reimbursement of expenses for the branch office, are denied. Also, the determinations made here are limited by the provisions of Penal Law § 60.27 and “shall not limit, preclude or impair any liability for damages in any civil action or proceeding for an amount in excess of’ the amount of reparation imposed by this decision and paid by the defendant (Penal Law § 60.27 [6]).

. Penal Law § 60.27 (1) allows a court to require a “defendant to make restitution of the fruits of his or her offense or reparation of the actual out-of-pocket loss thereby.” (Emphasis added.)

. See People’s exhibit 1 at 3, 4 and 7.

. See People’s exhibit 1 at 3, 4 and 7; People’s exhibit 3, deposit nos. 3 (McKenna to lease), 4 (Lee to lease), 5 (Cockren to lease), 6 (Blanchard/ Gardner to lease), and CRR sale 151 (Dalton to Prouty).

. People’s exhibit 3.

. People’s exhibit 2.

. See People’s exhibits 4, 15 and 22.

. Loan — $10,000; McKenna to lease — $1,327.50; Lee to lease — $890; Cocieren to lease — $3,753; Blanchard/Gardner to lease — $925; DeNeale to lease— $3,625; Dalton to Denton — $1,120; Dalton to Weber — $500; and Dalton to Prouty — $252.50.

. See People’s exhibit 20 and defendant’s exhibit B. The closing occurred on February 25, 2005 and the listing contract did not expire until April 26, 2005.

. See People’s exhibit 21 and defendant’s exhibit C. The closing occurred on February 25, 2005 and the listing contract did not expire until April 2005.

. See People’s exhibit 22 and defendant’s exhibit D. The closing occurred on April 12, 2005 and the listing contract did not expire until June 7, 2005.